J-A05023-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| C.B.J. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| A.L.S. | : | No. 1466 WDA 2018 |

Appeal from the Order Entered October 2, 2018
In the Court of Common Pleas of Blair County Civil Division at No(s):
2016 GN 3494

BEFORE:  GANTMAN, P.J.E., SHOGAN, J., and MURRAY, J.

MEMORANDUM BY SHOGAN, J.:                    **FILED MARCH 29, 2019**

C.B.J. ("Father") appeals from the October 2, 2018 custody order in the Court of Common Pleas of Blair County that granted the request of A.L.S. ("Mother") to relocate with the parties' daughter, R.J., presently fifteen years old, and son C.B.J., Jr., currently age twelve (collectively "the children"), from Tyrone, Pennsylvania, to Arlington, Texas.  Upon careful review, we affirm.

This appeal arises from the custody order originally dated August 18, 2017, and entered on August 22, 2017, granting Mother's request to relocate the children to Arlington, Texas,[1] following an evidentiary hearing on April 19,

_____

[1]  On July 9, 2016, Mother married L.M.S. ("Stepfather"), who resides in Arlington, Texas.  N.T., 8/18/17, at 22–23.  Stepfather has one biological son, M.S., who was eleven years old at the time of the subject proceedings in 2017. N.T., 8/18/17, at 25–26.

2017, during which the children testified *in camera* in the presence of the parties' counsel, and August 18, 2017, wherein Mother and Father testified.[2] In addition, on August 18, 2017, counsel for the parties stipulated to the testimony of Stepfather. *See* N.T., 8/18/17, at 87–88. With respect to Father's girlfriend, E.B., counsel stipulated to Mother's Exhibit 7, which included "the . . . subpoena [to E.B. to appear and testify on August 18, 2017,] on the front page and the return service on the back page[.]" *Id.* at 89. Counsel stipulated, "[E.B.] did not appear today, . . . she did not contact [the private investigator who served her in person with the subpoena on June 18, 2017,] and she did not contact [Mother's counsel's] office." *Id.*

At the conclusion of the testimonial evidence, the court granted the parties shared legal custody, Mother primary physical custody during the school year, and Father partial physical custody on all school breaks that are longer than three days and any time he visits Texas. During the summer, the court granted Father primary physical custody from one week after school ends until two weeks before school begins, and Mother partial physical custody on alternating weekends during the summer if she is in Blair County. The

---

[2] In addition, by separate order dated August 18, 2017, the court dismissed the parties' cross-petitions for contempt, filed by Father and Mother on March 7, 2017, and March 17, 2017, respectively. In the order, the court stated, "[I]n [the court's] [o]pinion in support of [o]rder, it did find that Mother improperly discussed adult and court matters with the children and if the [c]ourt found this factually to be true in the future, the [c]ourt would entertain a contempt sanction of $250 for each event or other remedy." Order, 8/18/17.

court directed that Mother "must provide one-half of the transportation for each period of physical custody with the children and their Father." Order, 8/18/17, at ¶ 7.

Father timely appealed the custody order, and, upon review, this Court vacated. *See C.B.J. v. A.L.S.*, 193 A.3d 1115 (Pa. Super. 2018) (unpublished memorandum). We remanded the case to the trial court to address whether Mother attempted to thwart the children's relationship with Father, a relocation factor set forth in 23 Pa.C.S. § 5337(h)(5), which had been omitted by the trial court in its consideration of the relocation factors.[3] *Id.*; Trial Court Opinion, 9/1/17.

On remand, the trial court, on September 7, 2018, filed a supplement to its opinion accompanying the original order, wherein it addressed the existing evidence in light of 23 Pa.C.S. § 5337(h)(5). By order dated October 2, 2018, the trial court re-entered the original custody order.

On October 12, 2018, Father timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed its Rule 1925(a) opinion on October 24, 2018.

---

[3] The trial court stated that although this Court vacated the order, "the parties acted as though it was still in effect, with the children living with Mother in Texas during the school year and returning to Father in Pennsylvania for all holidays and summer vacation." Trial Court Opinion, 10/24/18, at 2, n.1.

- 3 -

Prior to reviewing Father's questions on appeal, we summarize the factual history of this case, as follows: Father and Mother were married when R.J. was approximately three years old. N.T., 8/18/17, at 11. They separated in June of 2009, when R.J. was five years old, and C.J., Jr., was two years old.[4] *Id.* at 12.

On August 1, 2009, Mother and the children moved from the marital home in Colver, Cambria County, to Tyrone, Blair County, where they resided at the time of the subject proceedings. *Id.* at 14, 99. Soon thereafter, on a date unspecified in the record, Father also moved to Tyrone, Blair County. He rented an apartment until approximately 2014, when he purchased a house in Tyrone that was approximately two blocks from Mother's house. *Id.* at 90, 92, 95.

By agreed-upon order dated August 4, 2009, the Cambria County Court of Common Pleas granted the parties shared legal and equally shared physical custody on an alternating weekly basis.[5] By agreed-upon order dated October

_____

[4] Father testified that the court issued a divorce decree in June of 2013. N.T., 8/18/17, at 108.

[5] The order directed that Father's physical custody "shall be supervised 24/7 by the paternal grandmother . . ., until such time as [F]ather obtains a residence in Tyrone, Pennsylvania, and he obtains a letter from Dr. Babich indicating that he does not pose any harm or danger to the minor children. . . . Once those conditions have been satisfied, [F]ather's periods of . . . custody need no longer be supervised." Order, 8/4/09, at ¶ 10.

21, 2009, the court granted the parties the right to physical custody of the children if the other party was unavailable during his or her custody time. N.T., 8/18/17, at 16-17, 59. Because Father is employed Monday through Friday from 8:15 a.m. to 4:15 p.m., Mother testified that during the summer, Father drops the children off at her house during his custody weeks "any time between 7:15 [a.m.] and 7:30 [a.m.]." *Id.* at 18, 100–101. She testified that Father retrieves the children between 5:00 and 6:00 p.m. *Id.*

On February 9, 2017, Mother filed the subject relocation request in the Blair County Court of Common Pleas. Father filed a counter-affidavit on February 16, 2017, wherein he objected to the children's relocation and to modification of the custody order.[6]

_____

Father testified that he agreed to the foregoing supervised physical custody provision in settlement of a temporary Protection from Abuse ("PFA") order entered against him on behalf of Mother and the children near the time of the parties' separation. N.T., 8/18/17, at 95. Mother testified that, as a result of the supervised physical custody provision, the temporary PFA order was dismissed, and a no-contact order was entered against Father on her behalf. *Id.* at 10. Father testified that his physical custody of the children became unsupervised approximately two months after the date of the order, or in September of 2009. *Id.* at 154-155.

[6] In the parties' cross-petitions for contempt, referenced above, they each alleged violations of the August 4, 2009 custody order providing that they not "discuss with the children any proposed changes to the custody schedule or any other issue requiring consultation and agreement, prior to discussing the matter and reaching an agreement with the other parent." Father's Petition, 3/7/17, at ¶ 17(A); Mother's Petition, 3/17/17, at ¶ 2. In addition, Father alleged that Mother violated the provision prohibiting them from "mak[ing] any remarks or do[ing] anything whatsoever which can in any way be construed as derogatory or uncomplimentary to the other, and it shall be the

In his appeal from the re-entry of the order granting Mother's relocation request after remand, Father raises the following issues for our review:

I.   Whether the trial court erred and/or abused its discretion in granting the Defendant/Mother's request to relocate with the parties' two minor children to Texas under the law and the facts and circumstances of this case[?]

II.   Whether the trial court erred and/or abused its discretion in granting primary physical custody of the subject children to the Defendant/Mother under the law and the facts and circumstances of this case[?]

Father's Brief at 9.

We review Father's issues according to the following scope and standard of review:

The appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. . . . However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. . . . Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

*R.M.G., Jr. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa. Super. 2009) (quoting *Bovard v. Baker*, 775 A.2d 835, 838 (Pa. Super. 2001)). Moreover,

On issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the

_____

duty of both [parties] to uphold the other as being one who said minor children should love and respect." Father's Petition, 3/7/17, at ¶ 17(B).

opportunity to observe the proceedings and demeanor of the witnesses.

The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

*R.M.G., Jr.*, *supra* at 1237 (internal citations omitted). The test is whether the evidence of record supports the trial court's conclusions. *Ketterer v. Seifert*, 902 A.2d 533, 539 (Pa. Super. 2006).

*A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014). In addition:

[T]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006) (quoting *Jackson v. Beck*, 858 A.2d 1250, 1254 (Pa. Super. 2004)).

The primary concern in any custody case is the best interests of the child. "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual wellbeing." *Saintz v. Rinker*, 902 A.2d 509, 512 (Pa. Super. 2006) (citing *Arnold v. Arnold*, 847 A.2d 674, 677 (Pa. Super. 2004)).

Child custody actions are governed by the Child Custody Act ("Act"), 23 Pa.C.S. §§ 5321–5340. When making a decision on relocation that also

involves custody, "the trial court must consider all ten relocation factors and all sixteen custody factors" outlined in the Act. ***A.M.S. v. M.R.C.***, 70 A.3d 830, 836 (Pa. Super. 2013).

Section 5337(h) of the Act provides as follows.

**(h) Relocation factors.--**In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:

1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.

2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

4) The child's preference, taking into consideration the age and maturity of the child.

5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

8) The reasons and motivation of each party for seeking or opposing the relocation.

9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

10) Any other factor affecting the best interest of the child.

23 Pa.C.S. § 5337(h).

As the party proposing relocation, Mother has the burden of proving that relocation will serve the children's best interests as set forth under Section 5337(h). 23 Pa.C.S. § 5337(i)(1). In addition, "[e]ach party has the burden of establishing the integrity of that party's motives in either seeking the relocation or seeking to prevent the relocation." 23 Pa.C.S. § 5337(i)(2).

Section 5328(a) of the Act provides as follows:

§ 5328. Factors to consider when awarding custody.

**(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

3) (2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

4) The parental duties performed by each party on behalf of the child.

5) The need for stability and continuity in the child's education, family life and community life.

6) The availability of extended family.

7) The child's sibling relationships.

8) The well-reasoned preference of the child, based on the child's maturity and judgment.

9) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

10) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

11) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

12) The proximity of the residences of the parties.

13) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

14) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

15) The history of drug or alcohol abuse of a party or member of a party's household.

16) The mental and physical condition of a party or member of a party's household.

17) Any other relevant factor.

23 Pa.C.S. § 5328(a).

This Court has explained:

> When deciding a petition to modify custody, a court must conduct a thorough analysis of the best interests of the child based on the relevant Section 5328(a) factors. *E.D. v. M.P.*, 33 A.3d 73, 80 (Pa. Super. 2011). "**All** of the factors listed in section 5328(a) are required to be considered by the trial court when entering a custody order." *J.R.M. v. J.E.A.*, 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis in original). Section 5337(h) requires courts to consider all relocation factors. *E.D., supra* at 81. The record must be clear on appeal that the trial court considered all the factors. *Id.*
>
> Section 5323(d) provides that a trial court "shall delineate the reasons for its decision on the record in open court or in a written opinion or order." 23 Pa.C.S.A. § 5323(d). Additionally, "section 5323(d) requires the trial court to set forth its mandatory assessment of the sixteen [Section 5328 custody] factors prior to the deadline by which a litigant must file a notice of appeal." *C.B. v. J.B.*, 65 A.3d 946, 955 (Pa. Super. 2013), *appeal denied*, __ Pa. __, 70 A.3d 808 (2013). Section 5323(d) applies to cases involving custody and relocation. *A.M.S. v. M.R.C.*, 70 A.3d 830, 835 (Pa. Super.2013).

*A.V.*, 87 A.3d at 822–823 (emphasis in original).

On appeal, Father argues that the trial court abused its discretion with respect to the relocation and custody factors. He asserts that Mother did not satisfy her burden of proving that it is in the children's best interests to relocate to Texas. Father's Brief at 21. Father asserts that the court abused its discretion in failing to grant him primary physical custody if Mother relocated to Texas.

- 11 -

The crux of Father's argument is that the court abused its discretion in failing to find that Mother made "concerted efforts since July of 2016 to impede and impair R.J.'s relationship with" him. Father's Brief at 26. Specifically, Father contends:

> Since [July of 2016], Mother kept the children from seeing Father during her custodial weeks, which was contrary to the parties' prior practice. Mother also permitted R.J. to see seven-year-old legal documents containing derogatory allegations against Father that were never proven, and generally painted Father as a liar and an abuser of women. Mother's statements and actions resulted in R.J's [sic] being wary and fearful of Father and having a very negative attitude toward him, as evidenced by her *in camera* testimony and her social media posts that were admitted into evidence as exhibits.

*Id.* at 26–27.

Thus, Father argues that the court abused its discretion and erred regarding its Section 5337(h)(5) determination, "[w]hether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party," and Section 5328(a)(8), "[t]he attempts of a parent to turn the child against the other parent." Father contends that the trial court abused its discretion in failing to properly weigh Section 5328(a)(1), which party is more likely to encourage and permit frequent and continuing contact between the children and the other party, which it found in Father's favor. Father's Brief at 39. Father asserts that the court abused its discretion pursuant to Section 5337(h)(3), the feasibility of preserving the relationship between the non-relocating party and the child through suitable custody arrangements. He maintains that his relationship

with R.J. will further deteriorate "by merely affording time together on school breaks and summer vacations." Father's Brief at 27. In addition, pursuant to Section 5337(h)(4) and Section 5328(a)(7), which require consideration of the child's preference, Father contends that R.J.'s preference to move to Texas was not the result of a mature and well-reasoned decision. *Id.*

R.J. was thirteen years old at the time of her *in camera* interview. She stated that there are times "I am down because of like the court battle going [on] between my mom and dad." N.T., 4/19/17, at 10. She acknowledged that the litigation upsets her, and "I don't like it too well." *Id.* R.J. testified as follows:

> BY THE COURT: [H]ow would you feel about living with your stepdad and your mom in Texas?
>
> [R.J.]: I would like that.
>
> BY THE COURT: Why do you think you would like that?
>
> [R.J.]: Well . . . there is an art school down there, an art academy you have to enroll to get in. I have been making art my whole life and I want to be successful in art, and I think the arts academy would help me a lot.
>
> BY THE COURT: Would you still want to move to Texas with your mom and your stepfather if for some reason that art academy was not a possibility?
>
> [R.J.]: Yeah. There is another art academy down there and if I don't get enrolled this year, if I move down there, I can next year.
>
> BY THE COURT: Are there any other reasons besides the arts academy why you would favor Texas over Tyrone?

[R.J.]: Well, I have new family down there including a new step cousin . . . and even in a short time we grew pretty close and I would like to see her more.

*Id.* at 11–12.

R.J. testified that she feels "somewhat" safe at Father's house. *Id.* at 21. She explained:

BY THE COURT: Qualify your response. You said yes, somewhat. What do you mean by somewhat?

[A.]: Well, my dad and his girlfriend, who is actually already married to someone else, when she was in the house, they sometimes got into nasty fights.[7]

*Id.* at 21–22. In addition, R.J. replied that she was "pretty mad" at Father for opening an account on a social media site and surreptitiously contacting her on that site. *Id.* at 22. She stated, "[I]t makes me mad because like he is not straightforward. He's not telling me about it and I feel like he is watching my every move, and he gets mad at anything that I say like that he just disagrees with." *Id.*

Upon examination by Mother's counsel, R.J. testified as follows:

[Q.]: Why did you refer or what do you mean by nasty fights [between Father and E.B.]?

---

[7] R.J. testified that she believed that E.B. is married to another man because "I constantly heard conversations between [E.B.] and my dad." N.T., 4/19/17, at 49. There is no evidence of record concerning E.B.'s marital status. R.J. testified that she does not "really see [E.B.] as a parental figure like my mom and my dad or Stepfather." *Id.* at 25. She explained that this is because E.B. "is already married to someone else. . . ." *Id.* at 25–26.

- 14 -

[A.]:  Like bad fights.  Like they were yelling at each other and I recall at one point in a fight that my dad locked [E.B.] out of the house and I could hear her crying.

[Q.]:  Did you see those two fighting?  You were present?

[A.]:  Yes, but I was trying to ignore it.  I was on a computer and I was trying to ignore it because I don't like it.

[Q.]:  Did those arguments normally occur at your dad's house, or did those arguments occur at other places?

[A.]:  At my dad's house.

* * *

[A.]:  I think the fight where my dad shut [E.B.] out of the house . . . I think that was the one that got so bad that my dad took us to my mom[']s.

[Q.]:  So have there been times that your dad[,] or it was a time for you to spend with your dad[,] where you were saying he took you back to your mom's because of the fighting?

[A.]:  Yes.

[Q.]:  Has that happened several times?

[A.]:  I think a couple of times. I don't remember exactly how many.

*Id.* at 32–33.  She further testified on cross-examination that her relationship with Mother is "[c]lose," and her relationship with Father is "[s]omewhat close." *Id.* at 35.

The trial court found the totality of R.J.'s testimony credible and "maturely expressed for her age." Trial Court Opinion, 9/7/18, at 18.  Clearly, the court considered R.J.'s preference in fashioning the subject order.

C.J., Jr., was ten years old at the time of his *in camera* interview. He testified as follows upon examination by Mother's counsel:

[Q.]: How would you feel about moving to Texas?

[A.]: I think that I would be okay with moving to Texas because I have my stepbrother and my stepdad there.

[Q.]: If you moved to Texas, you would miss your friends; right?

[A.]: Yeah.

[Q.]: And you would miss your dad too, right?

[A.] Yeah.

*Id.* at 81–82. The trial court noted the foregoing testimony by C.J., Jr., but it did not consider it in fashioning the subject order "because of his age and lack of maturity." Trial Court Opinion, 9/1/17, at 8.

With respect to Father's relationship with E.B., Father testified that E.B. moved out of his home in April of 2017, and that she does not currently reside with him. N.T., 8/18/17, at 156–157. R.J. testified that E.B. "lived with us for about two years." N.T., 4/19/17, at 25. Father testified that E.B. resides with her brother in Palmyra, New York, but that E.B. visits him approximately "every two weeks." N.T., 8/18/17, at 111. R.J. testified that E.B. "is like in and out of [Father's] house a lot." N.T., 4/19/17, at 26. Father stated that his relationship with E.B. is "[v]ery good. I mean, we are tight. I suspect eventual marriage." N.T., 8/18/17, at 158.

Father denied on cross-examination that domestic violence occurred between him and E.B. He testified, "We have had some bad fights, but domestic violence, no." *Id.* However, Father also admitted:

Q. Did you make a call up to the Tyrone Police Department on January 10, 2016, relative to a domestic incident with [E.B.]?

A. Yes.

*Id.* at 158. Father reviewed the police report, marked as Mother's Exhibit 8, and acknowledged that at the time of the January 10, 2016 incident, he and E.B. had been drinking alcohol. *Id.* at 159. He denied the accuracy of the report, which stated, "[C]aller stated that girlfriend threatening male with a knife. Knife is in the kitchen. Female used it to threaten male and then cuts herself." *Id.* at 160. Rather, Father testified that E.B. "threw a knife across the kitchen, but she did not threaten me with a knife. She did not throw the knife at me, and she did not cut herself."[8] *Id.*

_____

[8] Father acknowledged on cross-examination that upon leaving his residence in April 2017, E.B. lived in a shelter for abused women for an unspecified time. N.T., 8/18/17, at 183. Father testified on redirect examination:

Q. Did you in any way abuse [E.B.] to force her to go into the abuse shelter?

A. No, I did not.

*Id.* at 184.

- 17 -

In contrast to R.J.'s testimony, Father testified on direct examination, "[E.B.] and I have never had a fight in front of the kids." *Id.* at 114. With respect to E.B., Father explained:

> We get along well and we always have. Yes, we have had . . . some heated arguments but never in front of the kids. The kids have never witnessed any heated argument that we might have had.

*Id.* at 115.

Father acknowledged on cross-examination, however, that he called the Tyrone Police Department again on February 29, 2016, due to a verbal argument between E.B. and him, at which time the children were present and sleeping in their bedrooms. *Id.* at 161–162. Father testified that E.B. was drinking at the time of that incident, but he was not drinking. *Id.* at 162. Further, Father admitted that on yet another occasion, he and E.B. started to argue, and "I was worried it was going to get heated, so I took [the children] . . . to [Mother's] house just in case it got out of hand." *Id.* at 164. Father acknowledged that he and E.B. had been drinking during that incident as well.[9]

*Id.*

With the foregoing testimony in mind, we review the trial court's analysis of the record evidence in light of the relocation and custody factors

---

[9] Father denied that he or E.B. have a problem with alcohol. N.T., 8/18/17, at 164. Moreover, the trial court found that alcohol was not a factor in this case. Trial Court Opinion, 9/1/17, at 15 (addressing 23 Pa.C.S. § 5328(a)(14)).

outlined above. Initially, with respect to this Court's directive on remand regarding Section 5337(h)(5), whether there is an established pattern of conduct by Mother to thwart the children's relationship with Father, the trial court explained in its September 7, 2018 supplemental opinion that it found "much of Father's testimony" not credible in this regard. Trial Court Opinion, 9/7/18, at 4. In fact, the trial court found that Mother promotes the children's relationship with Father. *Id.* at 10.

The court emphasized Father's testimony "to the effect that Mother left information up on her computer on purpose for her daughter [R.J.] to review." *Id.* at 11. The information related to unspecified websites regarding relocation. N.T., 8/18/17, at 73–74; N.T., 4/19/17, at 59. In addition, the court referenced R.J.'s testimony that she saw court documents on Mother's desk that included "police documents of my dad's and [E.B.]'s fights." N.T., 4/19/17, at 30. The trial court concluded:

> However, . . . Mother testified credibly that she did not realize that her daughter would snoop on her computer, and that it was not her intent that [R.J.] see those things. [Mother] testified credibly that she did not know her daughter was reading the material on her computer until Father sent her a message on August 4.
>
> Mother's testimony that she did not intend for the child to see anything on her computer or see papers in regards to the custody proceedings was supported by [R.J.] in her testimony. . . . Father's counsel asked, "So that was a place that your mom would know that he would be able to see it; right?" The child responded, "Yeah, well, I don't think that she knew that I read it." The attorney said, "I see, but it was out in the open for anyone to read, wasn't it?" The child replied, "Yeah. I don't think that she intended me to read it."

Trial Court Opinion, 9/7/18, at 11–12 (citing N.T., 4/19/17, at 59) (some citations to record omitted). Further, the trial court reasoned:

> The child also stated that her Mother did not tell her that [Father] lied, but that she, the child, came to realize that with the things that she saw. The totality of the testimony was that the child became aware of some things about [Father], like the fact that the police were called to his residence where he and his girlfriend had been drinking and got into a domestic dispute ([Mother's] Exhibit 8), but as the live testimony came into the trial court, it did not reveal that Mother was poisoning the child's mind against [Father] so as to thwart the parent-child relationship. The child also testified credibly that [Mother] does not say uncomplimentary things to her about [Father].

*Id.* at 12–13 (citations to record omitted).

R.J.'s testimony supports the trial court's findings insofar as she responded on cross-examination by Mother's counsel that Mother does not say uncomplimentary things about Father. N.T., 4/19/17, at 30. Regarding the police documents that R.J. found on Mother's desk, R.J. testified that she asked Mother about the documents, "and she told me." *Id.* at 29. As such, R.J. testified on cross-examination by Mother's counsel:

[Q.]: There was a [social media] post [by you] that made a reference to your dad being abusive. Do you remember that?

[A.]: Yes.

[Q.]: So my question is did your mom tell you that or is that information that you found out on your own?

[A.]: Both.

*Id.* at 28–29. The court underscored R.J.'s testimony that she witnessed arguments between Father and E.B., as well as R.J.'s testimony, confirmed by

Father, that Father returned the children to Mother's house during one such argument. Based on this evidence, the trial court found as credible R.J.'s testimony, which it summarized as, "[S]he made up her mind about various things about [Father,] not only from Mother telling her things[,] but because of things she saw and heard herself." Trial Court Opinion, 9/7/18, at 15.

With respect to what Mother told R.J., the court found, "Mother had spoken to [R.J.] about [Father's] personal life in a way that was not appropriate. . . ." Trial Court Opinion, 9/7/18, at 13. Nevertheless, it explained that its "overall assessment was merely that Mother showed bad judgment in talking to the child about the adult subject of Father's relationship with his girlfriend. That is the reason for the court's finding, not because the trial court thought [Mother] was trying to turn [the children] against [Father]." *Id.*; **see also** Trial Court Opinion, 9/1/17, at 11 (addressing Section 5337(h)(9), the present and past abuse committed by a party or a member of the party's household and whether there is a continued risk of harm to the child or an abused party).

To the contrary, the trial court concluded that Mother "attempted to promote, and not to thwart, the relationship between [Father] and the children." Trial Court Opinion, 9/7/18, at 10. Specifically, the trial court found:

> [Mother] testified that she gives [Father] substantial amounts of her [custody] time when his family visits, and that her personal feelings do not affect the arrangements. She further credibly testified that she has never attempted to prevent or sabotage the

- 21 -

relationship between the children and [Father]. She also testified credibly that she is engaged in activities that promote the relationship between the children and [Father], such as giving Father extra time with the children surrounding the event of a family weekend, and that she never has said "no" when asked for additional time by Father to have the children for events.

*Id.* at 9–10 (citations to record omitted). In addition, the trial court stated:

On cross-examination, Father's counsel brought out that Mother would not stop the children from going to Father and telling him something exciting or important that had happened in their lives. Mother also testified credibly on cross-examination that she would do everything within her power to preserve the children's relationship with [Father if the court granted her relocation request].

*Id.* at 10 (citations to record omitted).

Moreover, the trial court determined, "Mother also credibly testified that although she had discussed the [proposed] relocation with the children, she did not try in any way to assert any undue influence against them, did not interrogate them about this topic, or promise them anything." *Id.* at 9. The court continued:

[Mother] did not promise her daughter that she would be able to attend fine art school in Texas[.] [S]he told her that she would have to try out in order to get into that school. She testified reasonably that she felt as a parent that she had to bring up the subject of the relocation with the children.

*Id.* (citation to record omitted). In addition, we observe that R.J. testified Father discussed "the court" with her, that is, the relocation proposal, "[n]ot a lot, but like whenever he does, I don't feel very comfortable." N.T., 4/19/17, at 19.

In sum, the trial court found that neither parent "was actively failing to support or attempting to thwart the relationship of the children with the other parent." Trial Court Opinion, 9/7/18, at 15. Based on the record evidence, and on the well-settled principle that credibility determinations are within the sole province of the trial court, we discern no abuse of discretion by the trial court with respect to Section 5337(h)(5). **See A.V.**, 87 A.3d at 820 ("On issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.") (citation omitted).

Further, the trial court found that Section 5337(h)(5) is outweighed by other statutory factors. Trial Court Opinion, 9/7/18, at 16. Specifically, the court found determinative Section 5337(h)(1), which states: "The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life." The trial court found that "the children's relationship with their Mother is superior to that of their Father." Trial Court Opinion, 9/7/18, at 16. The court explained:

> The testimony in the case reveals that [M]other has been the primary caregiver of these children. The court found from testimony that although the parents have had in words a 50-50 custody schedule of the children, in fact [the children] have been primarily with Mother. The testimony was that Mother feeds the children, clothes the children, does homework with the children, takes care of all their needs, and is involved in their schooling.
>
> Specifically, [Mother] attends all school functions during and after school. She has been with the children on the first day of

school each year. She gets the children on and off the school bus. . . .

*Id.* Based on the testimonial evidence that the children are in Mother's custody on an alternating weekly basis and while Father is at work during his custodial weeks, we discern no abuse of discretion by the court.

Similarly, the trial court found, "Although they do love Father, [the children's] bond with Mother is stronger at this age." *Id.* at 19. The court credited Mother's testimony as follows:

> [Mother] was very close to her daughter who has a specific medical condition, PCOS, polycystic ovarian syndrome. The credible testimony was that the child is not comfortable talking about this medical condition with her Father. The testimony also was that the minor boy is a mama's boy and very close to his Mother. The court found from the totality of the credible testimony that the children at this age are closer to Mother and desire to be with her.

*Id.* at 17. Mother's and R.J.'s testimony supports the court's findings. R.J. testified:

> BY THE COURT: If you had a big problem and you needed to talk to somebody about it, who would you . . . talk to?
>
> [A.]: My mom.

N.T., 4/19/17, at 27. R.J. testified that she is "close" with Mother, and "[s]omewhat close" with Father. *Id.* at 35.

With respect to Section 5337(h)(2), "[t]he age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development," the trial court found that the needs of the children, then ages thirteen and ten, "will be best met during

the structure of the school year by Mother, who will be a stay-at-home parent and can attend to their needs during the day easily." Trial Court Opinion, 9/7/18, at 17. Mother's testimony supports the court's findings, in that she testified that Stepfather "is a senior engineer with Lockheed Martin in Grand Prairie, Texas," and that his salary is "[o]ne hundred six thousand [dollars] a year." N.T., 8/18/17, at 25, 66. As such, she testified that she will be a stay-at-home mom.[10] *Id.* at 35.

As discussed above, the trial court also weighed in Mother's favor R.J.'s preference to move to Texas pursuant to Section 5337(h)(4), the child's preference, taking into consideration the age and maturity of the child. Trial Court Opinion, 9/7/18, at 18. In addition, the court weighed in favor of Mother Section 5337(h)(7), "[w]hether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity." The trial court explained, "This is because [the children] are very close to their mother who has been their primary caretaker, and because they have both expressed a desire to relocate and an optimism that the relocation will be a good opportunity for them." Trial Court Opinion, 9/1/17, at 9. Further, the trial court found, "[T]he children will benefit by

_____

[10] Mother testified that she worked in her father's resale shop in Tyrone on Tuesdays through Saturdays, and on alternating Sundays from 9:00 a.m. to 4:00 p.m. N.T., 8/18/17, at 12.

their mother having better finances." *Id.* The testimony of Mother, R.J., and C.J., Jr., supports the court's findings.

It is important to note that the trial court concluded Father's relationship with the children will be preserved by the subject custody order under Section 5337(h)(3), "[t]he feasibility of preserving the relationship between the nonrelocating party and the child[ren] through suitable custody arrangements, considering the logistics and financial circumstances of the parties." The trial court based its conclusion on finding that both parents have the financial capability to contribute to the children's transportation for custody exchanges, and that the children "are experienced at using electronic forms of communication and may communicate with their father through Skype or cell phones which Mother testified would be provided to the children." Trial Court Opinion, 9/1/17, at 5–6. The parties' testimonial evidence supports these findings.

Finally, with respect to the Section 5328(a) custody factors, the court found determinative factor (a)(9), "[w]hich party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs," and factor (a)(10), "[w]hich party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child." The court weighed these factors in favor of Mother based on the children's ages and its conclusion that Mother has

effectively served as the children's primary caretaker throughout their lives. Trial Court Opinion, 9/7/18, at 18.

Father contests the trial court's factual findings with respect to the foregoing relocation and custody factors, but we discern no abuse of discretion. We recognize that the court's factual findings are based on its credibility determinations, and we must defer to them. **A.V.**, 87 A.3d at 820. Likewise, this Court may not disturb the amount of weight the trial court placed on the evidence and the factors it found determinative. **Id.**; **see also M.J.M. v. M.L.G.**, 63 A.3d 331, 339 (Pa. Super. 2013) ("It is within the trial court's purview as the finder of fact to determine which [statutory] factors are most salient and critical in each particular case.").

Therefore, we do not disturb the custody order to the extent that the court found that the children have a closer emotional relationship with Mother than with Father. In addition, we do not disturb the order despite the court finding, as noted *supra*, that under Section 5328(a)(1), Father is more likely to encourage and permit contact between the children and Mother.

Further, we conclude that the evidence of the troubled history between Father and E.B., a relationship Father "suspects" will result in "eventual marriage," supports the custody order. R.J. personally observed and disliked the "nasty fights" between Father and E.B. Father's continued relationship with E.B. at the time of the hearing supports granting Mother primary physical custody and granting her relocation request.

Because the trial court carefully and thoroughly considered the children's best interests with respect to Mother's relocation request, and we discern no abuse of discretion, we affirm the order.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/29/2019